**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**LAWRENCE H. TUDOR and
BETTY TUDOR, husband and wife,**

       **Plaintiffs,**

**v.**                                                    **Case No.:  3:15-cv-009014**

**ALLIED WASTE SERVICES OF
NORTH AMERICA, LLC., d/b/a/
REPUBLIC SERVICES OF
WEST VIRGINIA,**

       **Defendant.**

**<u>MEMORANDUM OPINION AND ORDER</u>**

      Pending is Defendant's motion for summary judgment. (ECF No. 57). For the following reasons, Defendant's motion is **GRANTED**.

**I.**    <u>**Background**</u>

      This case arises from an injury suffered by Lawrence Tudor ("Tudor") while working as a roll-off driver for the defendant, Allied Waste Services of North America, LLC ("Allied"). On December 13, 2013, Tudor was unloading a commercial trash compactor at a local landfill when he was struck in the face and upper body by a metal bar used to secure the door of the container. Tudor now asserts a deliberate intent claim against Allied under West Virginia law, and his wife alleges a loss of consortium claim.

      The following facts are undisputed. The injury-producing container was located at the West-End of the CSX train yard in Huntington, West Virginia. Tudor did not regularly service the CSX West-End container, but had been assigned to do so

1

approximately four times, including on December 13, 2013. The CSX West-End container was a detachable compactor-container with a door on one side through which the trash was dumped. The door was secured by a metal bar that was held in place by a pin, which was attached to a latch. To open the container's door, the roll-off driver would manually move the latch two to four inches to the right, in a clockwise direction. When the latch was moved a sufficient amount, the pin would detach, allowing the metal bar to swing open and the door to release. Tudor knew that he was supposed to stand to the right of the latch when opening the door, because when the pin detached, the metal bar swung out to the left with some force and could seriously injure an individual standing in front of it.

Approximately one or two years before Tudor's injury, Mr. Philip Mills, the union steward and a roll-off driver who regularly serviced the CSX West-End container, fastened a nylon strap with a buckle to an eyelet at the top of the latch, secured the strap to the left side of the container, and tightened the strap. Mr. Mills applied the nylon strap to the container as an extra precaution to ensure that the latch remained secured in a locked position during transport of the container to the landfill. According to Mr. Mills, he was concerned that the jostling of transport might cause the latch to accidently move, allowing the pin to detach, the metal bar to swing out, and the door to release, dumping trash onto the highway. Once at the landfill, the strap was removed by pulling up on its buckle.

Mr. Mills testified that he did not seek or have authorization from Allied to use the strap in that manner, and he never reported any concerns to Allied related to the container's latch, or the use of the strap. In fact, prior to Tudor's accident, numerous employees had serviced the container with the nylon strap attached, and no other

2

employee was injured, or reported any safety concerns to Allied related to the strap. Mr. Mills testified that he was not aware that placing the strap on the container to secure the latch might create a safety hazard. No other employee servicing the CSX West-End container testified that the strap created a safety hazard. Likewise, no one ever complained that by simply unbuckling the strap, the latch would move to the left to such a degree that the pin would detach, allowing the metal bar to swing out.

On the day of Tudor's accident, he picked up the CSX West-End container and took it to the landfill. While the container was still on the truck, Tudor went about opening the container door. Tudor noticed that the nylon strap was in place; however, the last roll-off driver had put the strap on backwards. Instead of applying the strap so that the buckle was on the end closest to the latch, the driver had reversed the strap, placing the buckle at the left side of the container door. Consequently, to reach the buckle and undo the strap, Tudor stood on the left side of the latch. According to Tudor, as soon as he reached up and unbuckled the strap, the metal bar came swinging out and struck him in the arm and face. Tudor was knocked to the ground and suffered injuries to his face, shoulders, neck, left arm, and legs.

Tudor complains that the nylon strap on the CSX West-End container created an unsafe working condition when the strap was placed in the reverse position. Tudor asserts that he was forced to stand to the left of the latch, in the path of the metal bar, in order to remove the strap. He contends that a metal chain and safety pin were missing from the container, which would have made the strap unnecessary in the first place. Tudor further alleges that several employees had complained about the unsafe condition of the container before his accident, including a complaint that the metal bar had swung out unexpectedly and struck an employee in the head. Nevertheless, Allied did nothing

3

to address the concerns. Finally, Tudor alleges that Allied violated standards implemented by the American National Standards Institute ("ANSI") pertinent to equipment and operations for wastes and recyclable materials, and had Allied abided by the standards, Tudor would not have been injured.

In response, Allied points out that Mr. Mills was never given permission to apply the nylon strap to the CSX West-End container and no one mentioned the strap's presence to Allied; therefore, Allied had no knowledge of the strap prior to Tudor's accident. Allied adds that notwithstanding Mr. Mills's lack of permission, his use of the strap did not violate any law or regulation applicable to the container. Allied notes that no other employee was injured as a result of the strap. In fact, even Tudor had serviced the container and removed the strap in the past without injury or complaint. Allied contends that it trained its employees, including Tudor, on how to service compactor-containers, and the employees knew not stand in front of the metal bar when opening the container's door. According to Allied, the nylon strap did not create a work hazard; instead, the hazard was created in this case by Tudor standing in front of the metal bar while opening the container, in direct contravention of his training. Finally, Allied argues that Tudor cannot establish that Allied deliberately exposed him to an unsafe work condition, as required to maintain a deliberate intent case.

## II.  <u>Relevant Law</u>

### A. Summary Judgment Standard

Summary judgment is proper under Fed. R. Civ. P. 56 when no genuine issue of material fact is in dispute, and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and a disputed issue of

material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. The party moving for summary judgment bears the burden of showing "an absence of evidence that demonstrates the existence of a genuine issue of fact for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). If the moving party carries this burden, then the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Concrete evidence includes "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The court must not resolve disputed facts nor weigh the evidence. *Russell v. Microdyne Corp.,* 65 F.3d 1229, 1239 (4th Cir. 1995). Instead, the court must accept as true the factual version of the nonmoving party and review the evidence "draw[ing] all justifiable inferences" in its favor. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520 (1991).

Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249-50).

### B. Deliberate Intent Standard

Under the West Virginia Workers Compensation Act, employers are generally immune from lawsuits seeking compensation for "injury or death to an employee." W. Va. Code § 23-4-2(d)(1). This immunity is lost, however, "if the employer or person against whom liability is asserted acted with 'deliberate intention.'" W. Va. Code § 23-4-2(d)(2). The Act provides two ways in which an employee may establish an employer's deliberate intent. In the instant action, Plaintiffs assert their claims under subsection 23-4-2(d)(2)(ii).[1] To demonstrate deliberate intent under this subsection, Plaintiffs must prove each of the following five elements:

(A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;

(B) That the employer, prior to the injury, had actual knowledge of the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition;

(C) That the specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer, as demonstrated by competent evidence of written standards or guidelines which reflect a consensus safety standard in the industry or business, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions;

(D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C), inclusive, of this paragraph, the employer nevertheless intentionally thereafter exposed an employee to the specific unsafe working condition; and

(E) That the employee exposed suffered serious compensable injury or compensable death as defined in section one, article four, chapter twenty-

---

[1]  W. Va. Code § 23–4–2 was significantly modified in June 2015. However, the parties agree that the version of the statute in effect at the time of Tudor's accident governs the analysis in this case.

three whether a claim for benefits under this chapter is filed or not as a direct and proximate result of the specific unsafe working condition.

W. Va. Code § 23–4–2(d)(2)(ii). If Plaintiffs are unable to make a *prima facie* showing supporting all five elements, "the court shall dismiss the action on a motion for summary judgment." W. Va. Code § 23–4–2(d)(2)(ii)(B). "That the [plaintiffs] may have a fairly good case considering only the other four facts is of no moment. The statute leaves no room for flexibility; the Legislature intended all five facts to be proven." *Greene v. Carolina Freight Carriers,* 663 F.Supp. 112, 115 (S.D. W. Va. 1987).

## III. <u>Analysis</u>

Having considered the evidence and the five elements, the court concludes that Allied is entitled to judgment as a matter of law.

### A.  Element 1—Unsafe Working Condition

"To establish the first element of their deliberate intent claim, plaintiffs must offer evidence identifying 'a specific unsafe working condition' that presented 'a high degree of risk and a strong probability of serious injury or death' as required by West Virginia Code § 23-4-2(d)(2)(ii)(A)." *Baisden v. Alpha & Omega Coal Company, LLC,* Civil Action No. 2:11-079, 2012 WL 259949, *5 (S.D. W. Va. Jan. 27, 2012). In other words, it is not enough for Plaintiffs to show "that an unsafe working condition could produce an injury." *Id.* at *8. Instead, Plaintiffs "must establish that the unsafe working condition presents both a 'high degree of risk' and 'a strong probability of serious injury or death.'" *Coe v. Outback Steakhouse of Florida, LLC,* Civil Action No. 1:11CV113, 2013 WL 140107, *3 (N.D. W. Va. Jan. 10, 2013) (quoting W. Va. Code § 23-4-2(d)(2)(ii)(A); *Marcus v. Holley,* 618 S.E.2d 517, 528 (W. Va. 2005)).

Plaintiffs claim that the nylon strap—when applied to the container with the

buckle away from the latch—constituted an unsafe working condition, because it required the roll-off driver to stand in front of the metal bar to release the strap, thus creating a high degree of risk and a strong probability of serious injury or death. To the contrary, Allied contends that even when placed with the buckle away from the latch, the nylon strap was not unsafe, because the roll-off driver could stand to the far left of the latch when removing the strap, outside the reach of the swinging metal bar, or he could duck below the metal bar. Moreover, Allied claims that Tudor knew he should not stand in front of the metal bar when opening the container's door. Therefore, if the position of the buckle forced him to do so, he should have followed Allied's protocol and contacted a dispatcher to report the issue, rather than place himself in jeopardy. Finally, Allied emphasizes that the record lacks any evidence to establish that the latch moved to the release position when Tudor unbuckled the strap. Allied argues that the record is devoid of admissible evidence showing that the nylon strap had any effect on the position of the latch, let alone evidence that the latch could move to the right simply by unbuckling the strap, a contention that Allied claims is contrary to the law of physics.

Plaintiffs offer evidence that, prior to Tudor's accident, several other roll-off drivers reported the CSX West-End container as being unsafe. At least one worker complained that the bar sprung out quickly and swung with the force of a baseball bat. (ECF No. 59 at 12-13). However, none of the complaints concerned the presence or use of the strap on the container, and none of the witnesses testified that the act of unbuckling the strap caused an unexpected release of the metal bar. Furthermore, none of the witnesses reported having to stand to the left of the latch, in front of the metal bar, in order to unbuckle the strap. Even Tudor admitted that he had never seen nor heard of the bar swinging free when the nylon strap was released or removed, and he did not

know what caused the bar to spring open on December 13, 2013. (ECF No. 57-2 at 18, 32-33; ECF No. 57-3 at 23, 39).

Philip Mills testified that he decided to apply the nylon strap, because he felt the strap would better secure the latch during transport. (ECF No. 57-4 at 14). Mr. Mills testified that he considered the strap to be an extra safety precaution, and he never thought the strap would create a hazard. Tudor testified that he had removed and replaced the nylon strap on the container after servicing it in the past, without incident, and he never reported the latch or strap as safety concerns. Furthermore, Tudor recalled approximately a half dozen other times that he placed similar nylon straps on different containers for extra security of the latch position, again without incident. (ECF No. 57-3 at 41). Tudor confirmed that he had never been injured as a result of a strap attached to the latch of a refuse container prior to December 13, 2013. (*Id.*).

Likewise, no witness testified that he ever saw the container's latch move when the strap was unbuckled, or had the latch slide to the open position without manually moving the latch to the right. An inspection of the container after Tudor's accident did not reveal any specific problems with the latch or the metal bar. The inspectors were unable to recreate the incident as described by Tudor. Philip Mills provided a possible explanation for Tudor's experience, suggesting that pressure from the weight of the trash against the door of the container caused the latch to move to the right when the adverse pressure exerted by the strap was removed. However, Mr. Mills's testimony is pure speculation. Even if it were valid and admissible evidence, testimony that the strap *could* present an unsafe working condition under certain circumstances simply is not enough to meet the requirements of the first element. As the court pointed out in *Baisden,* "subsection (A) requires more than a showing that an unsafe working condition could

produce an injury. The unsafe working condition must present a high degree of risk and strong probability of serious injury or death." *Baisden*, 2012 WL 259949, at *8.

Significantly, the unsafe working condition alleged by Plaintiffs is not the swinging of the metal bar, or the force of the bar when released, as those were ordinary hazards associated with the proper functioning of the container. Moreover, Plaintiffs do not allege that the nylon strap was unsafe when placed with the buckle close to the latch, because that placement did not require the roll-off driver to stand in front of the metal bar. Plaintiffs claim only that the strap constituted an unsafe working condition when applied with the buckle away from the latch.

To begin, Tudor simply does not supply evidence that unbuckling or removing the strap has ever set into motion the unlatching of the metal bar. Moreover, he is unable to prove that placing the strap on the container in reverse position was any more likely to cause the metal bar to prematurely spring open. The precise cause of the bar's release is, to date, unknown and may have resulted from a unique set of circumstances that only existed on December 13, 2013. Thus, while Tudor, "by virtue of his own injuries," has demonstrated that standing in front of the metal bar when unbuckling the strap can possibly result in injury, he has not met his burden to show that the reverse placement of the strap presented a high degree of risk and a strong probability of serious injury. *Coe,* 2013 WL 140107, at *4. "Had the legislature required a deferential 'possibility' or even a 'reasonable probably' standard, the outcome may be different. For if the lawmakers' inclusion of the adjective 'strong' is to have any meaning, it must require plaintiffs to present evidence indicating considerably more than a mere 'possibility' or even a 'reasonable probability' of serious injury or death." *Baisden,* 2012 WL 259949, at *8.

In its response in opposition to the motion for summary judgment, Plaintiffs also claim that Allied's failure to regularly inspect the container for safety hazards and its failure to properly repair structural defects in the container constituted an unsafe working condition. However, Plaintiffs produce no evidence to support those contentions. First, the evidence indicates that Allied required its employees to inspect their equipment and containers on a regular basis. A number of employees saw the strap on the CSX West-End container, but did not recognize it to be an unsafe working condition and did not report it as such. As far as the condition of the container, the record lacks evidence of specific structural or mechanical defects in the CSX West-End container. Similarly, there is no evidence that Allied repaired or modified the container in a way that made it hazardous. Testimony that reports were made of the container being "unsafe" consisted of second-hand stories, rumors, and vague statements, or the reports were unsubstantiated by the individuals who allegedly made them. Mr. Mills described being struck by the container's metal bar on one occasion, but did not attribute the accident to a defect in the container or to a hazard unrelated to the normal operation of the container. Rather, Mr. Mills testified that while he did not know what caused the incident, he believed it may have been due to his own "carelessness" or because he "got in a hurry." (ECF No. 59-2 at 5).

In contrast, Allied presented unrefuted evidence that no other employee suffered a serious injury servicing the CSX West-End container. Allied also has produced evidence that its drivers were trained to inspect their containers on each route and were required to report safety hazards. (ECF No. 59-3 at 10). Yet, no employee ever reported the container's latch or the nylon strap as safety concerns. The evidence establishes that the drivers knew to communicate their concerns on the route sheets they provided daily

11

to Allied's dispatch office and knew the protocols to follow when containers needed to be repaired. (*Id.*). The evidence indicates that most of the employees followed these directives.

Accordingly, Plaintiffs have failed to demonstrate that the strap created an unsafe working condition with a high degree of risk and a strong probability of serious injury or death.

## B. Element 2—Actual Knowledge of the Unsafe Working Condition and High Degree of Risk and Strong Probability of Serious Injury or Death

To establish the second element of deliberate intent, an employee must show that the employer possessed actual knowledge of the unsafe working condition, as well as the strong probability that the working condition would cause serious injury or death. The actual knowledge element "is not satisfied merely by evidence that the employer reasonably should have known of the specific unsafe working condition and of the strong probability of serious injury or death presented by the condition. Instead, it must be shown that the employer actually possessed such knowledge. *Blevins v. Beckley Magnetite, Inc.,* 408 S.E.2d 385, sly. pt. 3 (W. Va. 1991). This element has "a high threshold that cannot be successfully met by speculation or conjecture." *Mumaw v. U.S. Silica Co.,* 511 S.E.2d 117, 123 (W. Va. 1998).

When assessing evidence of actual knowledge, courts may consider "(1) whether any prior injuries had occurred because of the condition; (2) whether the employer previously had been cited by government officials for the violation; and (3) whether there had been any prior complaints that would have put the employer on notice of the high degree of risk and strong probability of serious injury or death created by the condition." *Baisden,* 2012 WL 259949, at *9. However, this type of evidence is not

required, and an employee may establish the actual knowledge element in cases "where

... [an] employer fail[s] to perform a reasonable evaluation to identify hazards in the

workplace in violation of a statute, rule or regulation imposing a mandatory duty to

perform the same, the performance of which may have readily identified certain

workplace hazards." *See Duncan v. ICG Beckley, LLC,* Civil Action No. 5:12-cv-00235,

2013 WL 1331226, *4 (S.D. W. Va. Apr. 2, 2013) (quoting *Ryan v. Clonch Indus.,* 639

S.E.2d 756, 759 (W. Va. 2006)).

Allied points out, and Plaintiffs do not dispute, that there is no evidence of any

prior injuries related to the use of the nylon strap on the container; no evidence that

Allied was ever cited for allowing the strap to be applied to the container; and no

evidence of complaints indicating that the simple act of unbuckling the strap caused a

sudden release of the metal bar. Instead, Plaintiffs rely on the West Virginia Supreme

Court of Appeal's ("WVSCA") opinion in *McComas v. ACF Indus., LLC,* 750 S.E.2d 235

(W.Va. 2013) to support their contention that Allied's violation of an industry standard

requiring periodic inspections of the container constituted actual knowledge of the

unsafe working condition created by the nylon strap and of the high risk and strong

probability that the strap would lead to serious injury.

In *McComas,* a factory employee was severely burned in 2004 when he flipped

the side-handle of a 480-volt switch box, causing an arc blast. The factory had installed

the switch box in the late 1950s or early 1960s and had never had the box inspected

despite a safety standard that required switch boxes, when energized, to be inspected for

overheating every three to six months and, when not energized, to be cleaned, inspected,

and subject to maintenance every three to six years. An investigation after the accident

confirmed that the arc blast was caused by a failure of the switch box's insulation, which

had disintegrated over time.

In its defense against the subsequent deliberate intent case brought by the injured employee, the factory asserted that it lacked actual knowledge of the insulation's decayed condition and, thus, did not know that the switch box presented an unsafe working condition with a strong probability of serious injury. Accordingly, the factory argued that the plaintiff could not establish all five elements required by the deliberate intent statute. The WVSCA rejected this defense, holding:

> [W]hen a safety statute, rule or regulation, or a commonly accepted and well-known safety standard within the industry or business, imposes a specifically identifiable duty to inspect upon the employer, and the inspection would have revealed the specific unsafe working condition, the employer may be found to have had actual knowledge of the specific unsafe working condition within the meaning of this State's deliberate intent statute

*McComas,* 750 S.E.2d at 243. The court reasoned that the West Virginia Legislature "did not intend to allow employers to shirk responsibilities imposed by specific statutes, rules, regulations or standards by turning a blind eye to workplace hazards. Willful ignorance of a specific unsafe working condition is no defense under subparagraph (B) of the deliberate intent statute." *Id.*

Here, Plaintiffs contend that ANSI standard Z245.30-2008, section 6.1 (e) requires employers engaging in the business of refuse removal to establish and follow "a program of periodic containers inspections." (ECF No. 57-9 at 5). Plaintiff argues that it has produced testimony from several Allied employees that no "program" of container inspection was ever established by Allied. Plaintiffs further assert that if Allied had conducted periodic inspections, as required, the improper use of the strap would have been revealed. In support of this assertion, Plaintiffs point to the testimony of two supervisors at Allied who indicated that if they had seen the strap on the container, they

would have had the container examined by maintenance to insure that it was safe.

Allied counters by contending that it followed a program of periodic containers inspections, noting the testimony of its employees confirming that Allied trained them to inspect the refuse containers and required them to report any unsafe equipment. In addition, each employee was given a safety handbook, which reiterated the employee's duty to inspect the containers and report concerns. Allied argues that no employee who serviced the CSX West-End container, including Tudor, ever advised management of a specific unsafe working condition related to the container. Furthermore, Allied contends that there is no evidence in the record to establish that the nylon strap was placed in the reverse position at any time before Tudor's accident, or that anyone suspected the strap as posing a high degree of risk resulting in the strong probability of serious injury.

"[T]he West Virginia Legislature intended only egregious acts or omissions by the employer to be actionable. One measure of the employer's culpability would be whether it ignored or circumvented a known legal duty—not the duty contemplated by principles of negligence law, but rather a duty which has been made express and specific by positive law or industry custom and practice." *Greene v. Carolina Freight Carriers*, 663 F. Supp. 112, 115 (S.D.W. Va. 1987), *aff'd,* 840 F.2d 10 (4th Cir. 1988). In order to meet the "actual knowledge" standard set forth in *McComas*, Plaintiffs must show the existence of a "specifically identifiable duty to inspect" applicable to Allied. In addition, Plaintiffs must show that had Allied performed the required inspection, the specific unsafe working condition would have been revealed. Plaintiffs plainly have not made these showings.

First, in regard to the duty to inspect, ANSI standard Z245.30-2008, section 6.1 (e) addresses the safety of waste containers and provides that a waste management employer is responsible for "establishing and following a program of periodic containers

15

inspections." (ECF No. 59-8 at 5). Assuming that this standard places a specific, identifiable duty on Allied to carry out periodic inspections of its containers, the evidence indicates that Allied complied with the standard. Allied offers the testimony of its supervisor, Jeremy Beaver. Mr. Beaver testified that every new employee starts off with training regarding the scope of their duties and their responsibilities. (ECF No. 57-6 at 24). They watch OSHA videos and are instructed that they have the duty to bring safety concerns to the attention of management. They are also advised of the consequences associated with a failure to report safety hazards. (*Id.* at 25). Each employee is given a Safe Actions for Excellence ("SAFE") handbook, which reiterates the employee's duties and responsibilities. According to Mr. Beaver, roll-off drivers are trained to inspect their containers on a continuous basis. He stated that supervisors also perform container inspections, but only when the situation arises or during observations. (*Id.*). For instance, Mr. Beaver testified that a supervisor must observe a post-accident employee once per week for four weeks after the accident, and a new hire is observed once per week for eight weeks. The remaining employees are observed approximately once each quarter. During the observations, the supervisor ensures that the driver is adhering to safety policies. Although the observations are not specifically conducted to inspect the containers, the supervisors naturally examine the containers as part of the observation process.

Allied also produced a copy of its SAFE handbook. (ECF No. 60-2). The SAFE handbook notifies employees that they are subject to discipline for failing to "properly check Company equipment according to prescribed standards" and for failing to "report defective equipment or unsafe conditions of any equipment or facility that may endanger an employee, customer, or member of the public." (*Id.* at 8). The handbook also requires

employees to "inform your supervisor of any safety hazards you find on your route so that they can be checked." (*Id.* at 12). Specifically, with respect to containers, drivers are instructed to "[i]nspect containers prior to service to ensure they are safe to dump or transport" and to "[r]eport damaged containers." (*Id.*).  Drivers are told to "[m]ake sure that no one is in the swing radius of the tailgate before unlatching it for unloading" and to "[w]rite up broken hinges, doors, rails, etc. on container/compactor repair request forms, which should be in the cab of each truck." (*Id.* at 25).

Plaintiffs do not dispute the existence of the SAFE standards, or the obligation placed by Allied on its drivers to regularly inspect the equipment, including the containers. Instead, Plaintiffs argue that the SAFE standards do not constitute a "program of periodic containers inspection" under the ANSI standard. Plaintiffs contend that the practice of requiring the drivers to inspect the containers is insufficient to comply with the ANSI standard and suggest that a "program" of inspection would require Allied's *supervisors* to conduct the inspections.

The undersigned finds Plaintiffs' position unpersuasive because the ANSI standard relied upon by Plaintiffs provides no guidelines or requirements for how the employer must structure its program of periodic inspections. The ANSI standard does not define the term "program" or the term "inspection," nor does it state that the program of periodic inspections must be something separate and distinct from daily inspections performed by the drivers who service the containers. The standard does not mandate that inspections be completed by supervisors or other management personnel, and does not provide a particular schedule for when the inspections should be performed. To the contrary, the standard only requires the employer to establish and follow a program of inspection, however the employer sees fit to do so.

17

Clearly, the case at bar is readily distinguishable from *McComas*. In *McComas*, the industry standard at issue was specific in outlining the duty owed by the employer, mandating that "fused, switch boxes, while energized, were to be inspected for overheating every three to six months and, when not energized, were subject to cleaning, inspection and maintenance every three to six years" and further "provid[ing] that '[i]nsulation integrity shall be maintained to support the voltage impressed.'" *See Long v. M & M Transp., LLC*, 44 F. Supp. 3d 636, 643–46 (N.D.W. Va. 2014), *aff'd,* 603 F. App'x 238 (4th Cir. 2015) (quoting *McComas,* 750 S.E.2d at 238). The injured employee in *McComas* could not have been expected to conduct the switch box inspection before pulling the handle, because he was a welder, not an electrician, and he had never been charged by his employer with conducting such inspections. Moreover, the employer in *McComas* had never conducted *any* inspection of the switch box in the 45 years since its installation, let alone one every three to six years specifically to search for "insulation integrity." The failures of the employer in *McComas* were egregious. In contrast, the alleged inadequacy of Allied's SAFE standards pertinent to container inspections is, at most, negligent. The difference in degree between the two is highlighted by the expert opinions in the cases. In *McComas,* the employee's expert opined that deterioration of the insulation caused the arc blast, and if the employer had conducted the required inspections and maintenance of the box, the safety hazard would certainly have been identified. On the other hand, in this case, Plaintiffs' expert opines only that Allied "possibly" violated the standard requiring periodic inspections and provides no opinion on whether the nylon strap would have been identified as a safety hazard.

Second, Plaintiff has not produced evidence demonstrating that an inspection of the CSX West-End container would have revealed the specific unsafe working condition.

18

Plaintiffs argue that two Allied supervisors would have sent the container to the container shop if they had seen the strap in use. It is evident from the testimony that the supervisors would have had the container examined by the shop because they presumed that the strap was being used to cure a defect in the container. However, there is no evidence that when the container was inspected after Tudor's accident, a defect was uncovered. Moreover, Mr. Mills testified that he added the strap as an extra precaution, not because the latch was broken or the pin that held the metal bar was failing. Likewise, there is nothing in the record to suggest that an inspection of the container would have revealed the danger associated with applying the strap in the reverse position, or that a visit to the shop would have stopped employees from using the strap on the container in the future. Plaintiffs ask the court to make a logical leap that simply is not supported by the available evidence. Therefore, the court finds that Plaintiffs have not made a *prima facie* showing of the second element required to sustain a deliberate intent case.

### C.   Element 3—The Safety Hazard Violates a Statute, Regulation, or Standard

Although Plaintiffs argue, to a degree, that Allied's failure to inspect, maintain, and repair the container is an unsafe working condition, their original claim was that the nylon strap, when placed in the reverse position on the container, was unsafe because it required the roll-off driver to stand in front of the metal bar when releasing the strap's buckle. As Allied correctly emphasizes, Plaintiffs have offered no particular statute, regulation, or standard that prohibits the use of a strap as a precautionary measure to secure the latch of a detachable compactor container during transport.

Plaintiffs contend that the presence of the nylon strap on the CSX West-End container violated ANSI Z245.30 § 6.1(d) and ANSI Z245.30 § 3.36. In addition, they

claim that Allied violated ANSI Z245.30 § 6.1(c) and (e) by failing to establish and follow a program of regular containers inspection and by failing to monitor the employees' use of the equipment. With respect to the first two standards, which require Allied to "provide properly maintained containers that meet all regulatory safety standards," to repair, modify, or reconstruct any structural or mechanical failures prior to placing a container in service, and to make any change, replacement, substitution, or overhaul of the equipment "in such a manner that the equipment and functions of the repaired portions remained the same as designed by the original manufacturer," Plaintiffs have failed to produce evidence substantiating Allied's alleged failures. First, no evidence was offered to establish that the latch on the pin holding the metal bar in place had malfunctioned at any time prior to Tudor's accident. Plaintiffs argue that "the use of the nylon strap is proof that the employer was not providing a 'properly maintained container.'" (ECF No. 59 at 10). The court disagrees. Mr. Mills explained that he applied the strap as an added precaution. He did not testify that the strap was applied to remedy a broken or defective latch. Second, there is no evidence that Allied made any modifications or substitutions to the container. Tudor testified that he believed a pin and chain to secure the latch were missing from the CSX West-End container; however, that testimony was never borne out by the evidence. Moreover, Allied was never told that any part of the container was broken, defective, or missing. Therefore, it made no modifications or repairs to the container.

In regard to the duty to inspect and monitor, Plaintiffs fail to offer evidence that Allied violated those standards. As previously stated, the evidence shows that the employees were trained and periodically monitored. Furthermore, Allied's employees were charged with making daily inspections of the containers they serviced. When the

container was ultimately examined after Tudor's accident, no malfunction or defects were uncovered. In addition, none of the employees who actually transported or dumped the container, including Tudor, ever considered the strap to pose a hazard. To the contrary, Mr. Mills, the roll-off driver regularly assigned the CSX West-End container, considered the strap to be an added safety precaution, preventing any unintended movement of the latch during transport. Thus, no employee of Allied, including the supervisors, actually identified the nylon strap, itself, as a safety hazard, and no witness, including Plaintiffs' expert witness, opined that *placement of the strap* created a high risk and a strong probability of serious injury.

### D.   Element 4—The Employer Deliberately Exposed the Employee to the Risk

The fourth element of the deliberate intent statute is linked to the actual knowledge element and "is not satisfied if the exposure of the employee to the condition was inadvertent or merely negligent." *Sias v. W-P Coal Co.,* 408 S.E.2d 321, 327 (W. Va. 1991). "At bottom, '[t] he 'deliberate intention' exception to the Workers' Compensation system is meant to deter the malicious employer, not to punish the stupid one." *Coe*, 2013 WL 140107, at *10 (citations omitted). Plaintiffs argue that this element of the deliberate intent statute is met by evidence showing that Tudor's job duties required him to service the defective container on December 13, 2013, and that there were no regular inspections or maintenance performed on the container. However, Plaintiffs offer no evidence that Tudor '"was ordered, directed, or even had it suggested to him' he was to engage in the unsafe conduct." *Id.* (quoting *Blevins,* 408 S.E.2d at 389).

The undisputed evidence shows that Allied was safety-conscious. The employees confirmed that Allied put an emphasis on training and safety, and they were not

discouraged from reporting safety hazards. Indeed, the employees were charged with inspecting the equipment they used and the containers they serviced to identify unsafe working conditions. Plaintiffs have provided no evidence that the drivers were not competent to conduct such inspections, or that Allied had no valid reason to rely on the eyes and ears of the many drivers who serviced the CSX West-End container. Certainly, one can argue that the drivers who worked with the containers on a daily basis were the most qualified individuals to conduct safety inspections, identify unsafe conditions, and report those to Allied's management. After all, the drivers were the individuals most familiar with the proper operation of the containers. Therefore, Plaintiffs have not made a *prima facie* showing that Allied deliberately exposed Tudor to a specific unsafe working condition despite the high risk and strong probability of serious injury.

### E.   Element 5—The Unsafe Working Condition Proximately Caused Injury

The parties agree that Tudor suffered serious injuries as a result of the metal bar striking him in the face. However, they do not agree that the injuries were caused by an unsafe working condition. Plaintiffs claim that the position of the nylon strap forced Tudor to stand in front of the bar. Defendant claims that Tudor knew not to stand in front of the bar, and he could have ducked, moved to the left of the bar, or called the dispatcher for assistance. Defendant also disputes that the unbuckling of the nylon strap caused the release of the metal bar.

In light of Plaintiffs' failure to make a *prima facie* showing on the other four elements of deliberate intent case, the court need not address this element.

### IV.   <u>Conclusion</u>

Wherefore, for the reasons set forth in this Memorandum Opinion and Order, the

court finds that Plaintiffs have not met their burden to resist Defendant's Motion for Summary Judgment. Accordingly, the Motion for Summary Judgment, (ECF No. 57), is **GRANTED**; the complaint is **DISMISSED**, **with prejudice**; and the case shall be removed from the docket of the court.

The Clerk is instructed to provide a copy of this Memorandum Opinion and Order to counsel of record.

**ENTERED:**  December 9, 2016

Cheryl A. Eifert
United States Magistrate Judge